[Civ. No. 40392. Second Dist., Div. One. Apr. 26, 1973.]

ALAN JAMES MARSHALL et al., Plaintiffs and Appellants, v. STATE PERSONNEL BOARD et al., Defendants and Appellants; MICHAEL KELLY, Plaintiff and Respondent.

## Counsel

Bruce P. Wolfe for Plaintiffs and Appellants.

Evelle J. Younger, Attorney General, and Ronald S. Marks, Deputy Attorney General, for Defendants and Appellants.

No appearance for Plaintiff and Respondent.

## Opinion

WOOD, P. J.—Michael Kelly, Alan Marshall, and William Miller, employees of the State of California (narcotic enforcement agents), sought a writ of mandate in the superior court compelling the State Personnel Board to vacate its decision suspending them as employees for 22 days without pay.

Marshall and Miller appeal from the judgment denying their petition for the writ. The Personnel Board appeals from the judgment granting Kelly's petition.

### Appeal of Marshall and Miller

On or about October 2, 1969, Marshall and Miller had been assigned to execute search warrants at four places—two in Whittier, one in Compton, and one in Long Beach. Five or six other officers were included in that assignment, and all the officers were divided into two teams for the

purpose of performing the assigned duties. Miller was on one team and Marshall was on the other.

A briefing of the officers with respect to those duties was to be held at the Lynwood police station on October 2, 1969, about 11 p.m.

On October 2, 1969, about 7:30 p.m., Miller arrived at a bowling alley (near that police station) where he ate dinner and drank two to four bottles of beer. About 10 p.m. of that day, Marshall arrived at the bowling alley and ate a hamburger and drank a bottle of beer there. Then they went to the police station for the briefing regarding the search warrants. After the briefing they proceeded to a place near the Whittier address where a search warrant was to be executed and waited until they were informed that the suspects were home and that all the officers were nearby and ready to proceed to the address.

As above indicated, Marshall and Miller were assigned, with five or six other officers, to execute warrants regarding two places in Whittier. Those places where warrants were to be executed were Apartment B and Apartment D at 8033 Comstock Street. Miller's team was to go to Apartment B, and Marshall's team was to go to Apartment D.

The apartment building was a two-story building on the front of which were two numbers—number 8033 and number 8031, with the number "8033" being immediately above the number "8031." The number "8033" was the street address for the five apartments on the second floor, which apartments were designated as apartments A, B, C, D, and E. The number "8031" was the street number for the five apartments on the first floor, which apartments were designated also as apartments A, B, C, D, and E. There was one entrance-way to the building (for both floors).

Marshall and Miller saw the number "8033" on the building, but did not see the other number "8031." The Miller team went to Apartment B of number 8031 (on the first floor); and the Marshall team went to Apartment D of 8031 (on the first floor). After the Miller team had "kicked in" the apartment door of Apartment B, and after Marshall had aroused an occupant of Apartment D, Miller went to Marshall and told him that they had gone to the wrong address.

Then the teams of officers went to the second floor—the Miller team to Apartment B and the Marshall team to Apartment D—and they served the warrants. While the teams were in the respective apartments on the second floor, an officer who was in Apartment B on the second floor discharged a gun through the second floor and killed a man who was in Apartment B on the first floor. (That officer was not Marshall or Miller.)

After Miller notified the Whittier police, Sergeant Shelters of the Whittier Police Department went to the Comstock address and made an investigation. He testified in substance: He was told by a man at that address that there was an odor of alcohol about the men who were involved there and he thought it should be investigated. At the Whittier police station, about 1:30 a.m. on October 3, 1969, he had a conversation with Marshall and Miller, in the presence of other officers, and he advised Marshall and Miller that there had been allegations that alcohol had been smelled on the personnel involved in the narcotics raid, and he felt that this was going to be a point of contention and it should be cleared up one way or the other; that he had just given a breathalyzer test to Officer Sweeney (whose gun allegedly had been discharged through the floor). He (sergeant) also said that everyone who was involved should take a breathalyzer test for the good of the investigation.

Marshall replied that he did not feel that he should take such a test, and that it was an insult for the sergeant to ask him to take the test. Miller made a statement which, in substance, was the same as the reply made by Marshall, and he further said that he would not take one, and that the sergeant should not take the prerogative of asking them to take the test. He (sergeant) attempted again to explain why he was asking them to take the test —he said that there had been allegations by citizens at the apartment complex that the people involved in the raid had alcohol upon their breath; that Sweeney had said that he had consumed some beers; he (sergeant) did smell alcohol on Sweeney; and since alcohol would be a point of contention, the breathalyzer test would clear the situation up for everyone's benefit. Neither Marshall nor Miller would take the test.

The proposed decision of the hearing officer (on the appeal of Marshall and Miller to the Personnel Board) stated, in part: That Marshall and Miller participated in the service of search warrants at an address in Whittier shortly after midnight of October 2-3, 1969. A rifle carried by one of the police officers in the team at that address accidentally discharged and killed a private citizen in an apartment below. As a part of the investigation of this tragedy a police officer of Whittier asked Marshall and Miller to take a breathalyzer test, and each of them refused to take this test. "Considering that each appellant [Marshall and Miller] had been drinking and that others on the raid had also been drinking, that a man had been killed under circumstances which raised questions as to the manner in which the whole operation had been conducted and that resolving any question as to the sobriety of the participants was an important part of the investigation, it is found that it was the duty of each of the appellants to take the breathalyzer test and otherwise cooperate fully with the Whittier

Police Department. Under the circumstances the failure of appellants Miller and Marshall to cooperate with the investigating officers by taking a breathalizer test constitutes inexcusable neglect of their duty as Agents of the Bureau of Narcotic Enforcement within the meaning of Government Code Section 19572(d)." The hearing officer determined that the punitive actions of suspension are sustained. The Personnel Board adopted the proposed decision as its decision, and sustained the suspension of Marshall and Miller. Upon the hearing of their petition for a writ of mandate, the superior court concluded that there was substantial evidence to sustain the decision of the Personnel Board. The petition of Marshall and Miller for a writ of mandate was denied; and their motion for a new trial was denied.

Appellants Marshall and Miller assert that the trial court, in reviewing the decision of the Personnel Board, should not have applied the substantial evidence rule in considering the evidence, but on the contrary the court should have exercised its own independent judgment on the evidence. They cite *Bixby* v. *Pierno,* 4 Cal.3d 130 [93 Cal.Rptr. 234, 481 P.2d 242]. In *Bixby* it was said (p. 143) that if the decision of an administrative agency will substantially affect vested rights, particularly the right to practice one's trade or profession, the trial court exercises its independent judgment upon the evidence. In that case, it was also stated (p. 147) that the administrative decision therein did not involve a fundamental right and therefore did not call for an independent judgment review. Also in that case, it was said (p. 134) "the trial court properly followed our long established approach to the judicial review of a decision of a statewide nonconstitutional agency, and applied to the decision the test of whether or not it was supported by substantial evidence." In *Martin* v. *State Personnel Bd.,* 26 Cal.App.3d 573 [103 Cal.Rptr. 306], the petitioner Martin, in contending that the court should have exercised its independent judgment as to the weight of the evidence at the administrative hearing, relied on the *Bixby* case. In *Martin* it was said (p. 577): "Martin's reliance upon *Bixby* is misplaced. That case was concerned with the review of decisions of statewide agencies which are *not* constitutionally authorized to exercise judicial functions. [Citation.] The *Bixby* opinion expressly pointed out that it did not involve 'a statewide agency upon which the California Constitution has specifically conferred adjudicative powers.' . . . In contrast, the factual determinations of the State Personnel Board—a statewide agency which was created by, and which derives its adjudicating power from, the state Constitution—'are not subject to re-examination in a trial de novo but are to be upheld by a reviewing court if they are supported by substantial evidence.' (*Shepherd* v. *State Personnel Board* (1957) 48 Cal.2d 41, 46-47 [307 P.2d 4].)"

■ The trial court did not err in applying the substantial evidence rule. There was substantial evidence to support the judgment denying the petition for writs of mandate as to Marshall and Miller.

## Appeal of Kelly

Also, on October 2, 1969 (same date as Marshall and Miller matter), Michael Kelly, who had been assigned with other officers to execute a search warrant at an address in Compton, attended the briefing of the officers at the Lynwood police station at 11 p.m. (As above indicated, the briefing pertained to the four places where the warrants were to be executed.) Soon after the briefing, Kelly, Deputy Sheriff Rodriguez, and an informant, entered a state-owned automobile and proceeded, with Kelly as the driver, toward the Compton address where a search warrant was to be executed. Three other persons, who had been at the briefing, proceeded toward the Compton address in another automobile which was driven by Agent Noriega. After Kelly had driven about a mile en route to the Compton address, he stopped the automobile, entered a liquor store and purchased a "six-pack" of beer—in 12-ounce cans. He returned to the automobile and, after driving about three blocks, parked the automobile on a side street where Agent Noriega also parked his automobile. Kelly gave a can of beer to each of the two persons who were with him in the automobile, and he kept a can of beer for himself; and he gave the remaining three cans of beer to the persons in the Noriega automobile. Kelly drank a can of beer while he was in the parked automobile. Then he drove the automobile to a location near the Compton address (one of the places where a search warrant was to be executed) and waited until other officers, who were in other automobiles, were at their designated locations, and waited until the suspects were at the Compton address. At the appropriate time he, Noriega, and the officers with them, went to the Compton address and served the search warrant.

The notice of punitive action against Kelly stated that such action was being taken for causes specified in Government Code section 19572, subsections as follows: (d) Inexcusable neglect of duty. (o) Wilful disobedience. (t) Failure of good behavior either during or outside of duty hours which is of such a nature that it causes discredit to his agency or his employment.

The proposed decision of the hearing officer (on Kelly's appeal to the Personnel Board) stated, in part, in finding II: Kelly, Noriega, three police officers, and an informant, travelled to Compton to serve a search warrant on the occupants of a residence. While en route to the location, Kelly stopped at a liquor store and purchased a six-pack of beer. Because

a delay was necessary before the warrants could be served, Kelly drove to a side street and parked the state vehicle he was driving. While sitting in the parked car at this location Kelly consumed one can of beer after having made a can available to each of the other members of the party.

The decision states further, in part: Kelly contends that prior to the October 2 "incident the Bureau's rules against consumption of alcoholic beverages while on duty had not been strictly enforced. This contention is found to be true. However, appellant [Kelly] had no reasonable basis for any belief that the Bureau would permit or condone the conduct found in Finding II. 'Six packing it in an automobile' in this manner is both illegal in itself and a failure of good behavior during duty hours of such a nature as to cause discredit to appellant's agency and his employment within the meaning of Government Code Section 19572(t). Appellant's conduct fully warrants the suspension action taken against him." The hearing officer determined that punitive action of suspension is sustained. The Personnel Board adopted the proposed decision as its decision, and sustained the suspension of Kelly.

Upon the hearing of the petition for a writ of mandate, the superior court concluded that there was not substantial evidence, in the record from the State Personnel Board, to uphold a suspension or other disciplinary proceeding against Kelly.

Section 4-23 of the Manual of Instructions of the Bureau of Narcotic Enforcement, Department of Justice, provides: "No employee shall drink alcoholic beverages while on duty except in the performance of his duty and at no time shall become so intoxicated as to conduct himself in a manner which is detrimental to the Bureau."

Section 3-4 of said instructions provides: "No employee shall at any time conduct himself or behave in a manner or be a party to an act which would discredit or tend to impair the good order and discipline of the Bureau."

Kelly's testimony at the administrative hearing, regarding his activities on said October 2, was in substance the same as is set forth in the above statement of facts regarding his activities. He testified further that he was familiar with the above-quoted rules of the Department of Justice on the subjects of alcoholic beverages and personal conduct and behavior.

He testified further: He and Noriega were the only two employees of the State Bureau of Narcotic Enforcement who were in the group of six persons who were going to the Compton address. He (Kelly) was the one who was assigned to serve the warrant, and he considered himself to be on

duty the entire evening, including the time he was purchasing and drinking the beer. Prior to said October 2 the bureau's rule against drinking was not strictly enforced. No one of the supervisory personnel had told him not to drink. Prior to October 2 he was told by an area supervisor (Shierloh) that it would be all right to have a limited amount of alcohol with a meal while on duty. One evening when he (Kelly) and other agents were eating and drinking in a restaurant, a field supervisor (Shoemaker) came in and told them to take it easy; and he thought that the supervisor also told them to keep the serious drinking until the deal was over.

Two field supervisors and an area supervisor, called as witnesses by Kelly, testified that prior to October 2 the rule against drinking while on duty was not strictly enforced. Those supervisors testified further, in substance, that it was permissible for agents to drink a moderate amount of alcoholic beverage with meals while on duty.

In response to a hypothetical question (by Kelly's counsel) embodying the evidence as to Kelly's drinking beer while in a street-parked automobile en route to serve a warrant, the supervisors above referred to testified in substance that, in their opinions, there was no significant difference between an agent's drinking alcoholic beverage as stated in the hypothetical question and his drinking alcoholic beverage with a meal while on duty.

One of those field supervisors (Leavy) testified further that he was in general charge of the entire operation on October 2; and thereafter disciplinary charges were filed against him, and his suspension was upheld by the Personnel Board.

The area supervisor above referred to (Newland) testified in response to a question on cross-examination, that if he had observed one of his agents, on October 2, drinking beer in a street-parked state automobile while on duty, he would have found such conduct of the agent to be improper, and he would have admonished him.

Field Supervisor Shierloh was called as a witness by respondent (the appointing power). Counsel for respondent recited a hypothetical statement of facts embodying the evidence as to Kelly's drinking beer in an automobile; and he asked the witness whether, as a field supervisor, he would have found anything improper in that conduct. He replied in the affirmative, and stated further that there should be no drinking on such occasions because it would leave an alcoholic odor, could cause complaints by the arrested person, the witnesses, people in court, and citizens, and it could reflect adversely on the reputation of the bureau.

Kelly's asserted defense at the administrative hearing was that his admitted violation of the rule, by drinking beer while on duty in a parked automobile on a street, should be excused because some of the bureau's supervisors did not enforce the rule when agents drank alcoholic beverages with meals in a restaurant. There was evidence that prior to October 2 the rule was not enforced by some supervisors when agents drank a moderate amount of alcoholic beverage with meals while on duty. It is not asserted by Kelly that, in making his decision to drink beer in an automobile on a street while on duty, he relied upon any alleged lack of enforcement of the rule as it applied to drinking alcoholic beverage in an automobile on a street while on duty. It seems to be the theory of Kelly's defense that the continued breach of the rule by some agents and supervisors (permitting agents to drink alcoholic beverage with meals) constituted in effect an amendment of the bureau's written rule—with the result (according to Kelly) that conduct originally prohibited by the rule was no longer prohibited. It does not appear that agents or supervisors had authority to make rules in conflict with the rules of the bureau. Kelly, a public employee—a law enforcement officer—had a duty to comply with rules of the bureau and with rules of law.

It would appear that Kelly was attempting to expand the area of alleged approval of agents' drinking while on duty to include drinking of alcoholic beverage in automobiles on highways. Section 23121 of the Vehicle Code provides: "No person shall drink any alcoholic beverage in any motor vehicle when such vehicle is upon any highway." Kelly's conduct in drinking beer in an automobile on a street was not only a violation of the Narcotic Enforcement Bureau's rule but it was a violation of statutory law. The Personnel Board, of course, was not required to accept the opinions of the three supervisors of narcotic enforcement to the effect that there is no difference between an agent's drinking alcoholic beverage with meals and his drinking such beverage in an automobile on the street. There was testimony by two supervisors that in their opinions an agent's drinking alcoholic beverage in an automobile on the street was improper under the bureau's rule—and it is unlawful.

It is clear that there was substantial evidence in the record of the hearing before the Personnel Board to support the board's decision affirming the suspension of Kelly. The superior court erred in granting Kelly's petition for a writ of mandate and vacating the decision of the Personnel Board as to Kelly.

The judgment of the superior court denying the petition of Alan James Marshall and William G. Miller for a writ of mandate is affirmed. The

judgment granting the petition of Michael Kelly for a writ of mandate is reversed, with the direction that the court enter judgment denying his petition.

Thompson, J., concurred.

A petition for a rehearing was denied May 23, 1973, and the petition of appellants Marshall and Miller and respondent Kelly for a hearing by the Supreme Court was denied June 20, 1973. Clark, J., did not participate therein.